Adam R. Alper (CA Bar No. 196834)
Bao Nguyen (CA Bar No. 198023)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94194
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: adam.alper@kirkland.com
Email: bao.nguyen@kirkland.com

Gregory S. Arovas, P.C. (*pro hac vice*)
Todd M. Friedman, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: greg.arovas@kirkland.com
Email: todd.friedman@kirkland.com

Nyika O. Strickland (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: nyika.strickland@kirkland.com

[Additional counsel listed on signature page]

Attorneys for Plaintiff
INTEL CORPORATION

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| INTEL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>TELA INNOVATIONS, INC.,<br><br>Defendant. | CASE NO. 18-CV-02848-WHO<br><br>**INTEL'S MOTION TO EXCLUDE CERTAIN DAMAGES OPINIONS OF JED GREENE FOR FAILURE TO MEET THE *DAUBERT* STANDARD**<br><br>Judge: Hon. William H. Orrick<br>Hearing Date: October 28, 2020<br>Time: 2:00 PM<br>Courtroom: 22<br><br>*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED* |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on October 28, 2020 at 2:00 p.m., or as soon thereafter as the matter may be heard in the Courtroom of the Hon. William H. Orrick in the United States District Court for the Northern District of California, San Francisco Courthouse, Courtroom 2, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiff Intel Corporation will move to exclude several opinions of Tela's damages expert, Mr. Jed Greene.

As set forth in the accompanying memorandum, Mr. Greene contrives to improperly increase the royalty payments set forth in several comparable license agreements and to puff up Tela's damages claim, such that he would expect Intel to pay far more than any of Tela's actual licensees for a license with a far narrower scope. These opinions fail to meet the minimum standards for reliability articulated in FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), and should therefore be excluded.

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND .................................................................................................... 3

III.    ARGUMENT .......................................................................................................... 4

   A.   The "Litigation Risk" Adjustment That Mr. Greene Uses To ████ the Asserted Damages Is Speculative and Unsupported ....................................................... 4

   B.   The "First Mover" Adjustment That Mr. Greene Uses To ████ His Damages Calculation Based on the Qualcomm License Is Also Speculative and Unsupported ................................................................................................... 9

   C.   Mr. Greene's Allocation of Value Among Tela's Patents Is Speculative and Unsupported ................................................................................................. 11

        1.  Mr. Greene Does Not Reliably Allocate Value to the Patents-in-Suit Relative to Tela's Overall Portfolio ................................................ 11

        2.  Mr. Greene's Theory for Allocating Value Among Patents Relies on General Statistics That Are Not Tied to the Facts of This Case. ............... 15

        3.  Mr. Greene Does Not Reliably Allocate Value to Subsets of the Patents-in-Suit ................................................................................... 16

   D.   Mr. Greene Improperly Relies on Undisputedly Non-Comparable License Agreements. ................................................................................................. 18

   E.   Mr. Greene Improperly Offers Technical Opinions That Are Beyond His Expertise as a Damages Expert ................................................................... 20

   F.   Mr. Greene Relies on Untested and Unsupported Projections of Future Tela Royalty Income ........................................................................................... 22

IV.     CONCLUSION ..................................................................................................... 24

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Avocent Redmond Corp. v. Rose Elecs.*,
   No. C06-1711RSL, 2013 WL 8844098 (W.D. Wash. Mar. 11, 2013) ...................................7

*Carucel Invs., L.P. v. Novatel Wireless, Inc.*,
   No. 16-CV-118-H-KSC, 2017 WL 1215838 (S.D. Cal. Apr. 3, 2017), *aff'd*, 730 F.
   App'x 938 (Fed. Cir. 2018) ...........................................................................................7

*Clear-View Techs., Inc. v. Rasnick*,
   No. 13-CV-02744-BLF, 2015 WL 3505003 (N.D. Cal. Jun. 2, 2015) ...............................23

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ................................................................................................1, 4, 24

*Digital Reg of Tex., LLC v. Adobe Sys., Inc.*,
   No. C 12-1971 CW, 2014 WL 4246158 (N.D. Cal. Aug. 27, 2014) ................................19

*Lucent Techs., Inc. v. Gateway*,
   580 F.3d 1301 (Fed. Cir. 2009)................................................................................18, 19

*Lust By & Through Lust v. Merrell Dow Pharm., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ..............................................................................................4

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
   476 F. Supp. 2d 1143 (N.D. Cal. 2007) ........................................................................6, 10

*Oracle Am., Inc. v. Google Inc.*,
   No. C 10-03561 WHA, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012) .............................14

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
   No. 8:14-CV-01352-JLS-KES, 2019 WL 8138163 (C.D. Cal. Nov. 20, 2019) ................22

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ............................................................................................4

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ....................................................................................18, 19

*TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
   No. CV 15-2370, 2018 WL 4488286, (C.D. Cal. Sept. 14, 2018) ....................................16

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ...................................................................................19, 20

1

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
   No. 15-CV-02383-RS, 2018 WL 5013580 (N.D. Cal. Oct. 16, 2018) ................................23

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
   No. 11-515-LPS-CJB, 2015 WL 12731924 (D. Del. Nov. 4, 2015) ................................21

*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002) ................................21

2

3

4

5

6 **Rules**

7

FED. R. EVID. 702................................................................................................................1, 4, 23

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF EXHIBITS**

| No. | Exhibit |
|-----|---------|
| 1 | Qualcomm Settlement & Patent License Agreement |
| 2 | TSMC Settlement and Patent License Agreement |
| 3 | Samsung License Agreement |
| 4 | Excerpts of Ms. Davis Report (May 8, 2020) |
| 5 | Excerpts of Mr. Greene Report (April 8, 2020) |
| 6 | Excerpts of Mr. Carney Deposition Transcript (August 6, 2019) |
| 7 | Excerpts of Mr. Carney Deposition Transcript (January 23, 2020) |
| 8 | Excerpts of Mr. Greene Deposition Transcript (July 13, 2020) |
| 9 | Excerpts of Tela's Verified Complaint in *Certain Integrated Circuit Devices*, ITC 337-TA-873 (February 7, 2013) |
| 10 | Excerpts of Tela's Verified Complaint in *Certain Integrated Circuit Devices*, ITC 337-TA-906 (April 3, 2014) |
| 11 | Excerpts of Jonathan D. Putnam, *Value Shares of Technologically Complex Products* (April 16, 2014) |
| 12 | Excerpts of Mark Schankerman, *How Valuable is Patent Protection? Estimates by Technology Field,* Rand Journal of Economics, Vol. 29, No. 1 (Spring 1998) |
| 13 | Excerpts of Dr. Foty Deposition (July 9, 2020) |
| 14 | Excerpts of Dr. Foty Deposition (July 10, 2020) |
| 15 | Excerpts of Mr. Greene Report (Litigation Risk Adjustment) |
| 16 | Excerpts of Mr. Greene Report (First Mover Adjustment) |
| 17 | Excerpts of Mr. Greene Report (Allocation of Value Among Patents) |
| 18 | Excerpts of Mr. Greene Report (Non-Comparable Licenses) |
| 19 | Excerpts of Mr. Greene Report (Technical Opinions) |
| 20 | Excerpts of Mr. Greene Report (Royalty Projections) |

## I.    INTRODUCTION & STATEMENT OF ISSUES

While both parties' damages experts rely primarily on three previous license agreements that cover Tela's patent portfolio, including the patents-in-suit, the experts take dramatically different approaches to analyzing these agreements.  Intel's expert appropriately adheres to the royalty rates stated in the agreements and in contemporaneous Tela documents.  In contrast, Tela's expert, Mr. Jed Greene, contrives to improperly increase the royalty rates set forth in the agreements and to puff up Tela's damages claim, such that he would expect Intel to pay far more than any of Tela's actual licensees for a license with a far narrower scope.  Intel will address many of the issues with Mr. Greene's opinions through cross-examination at trial.  However, there are several instances where Mr. Greene's analysis is completely untethered to any reliable—or even discernable—methodology and instead relies on unadorned speculation.  Not only do these portions of Mr. Greene's report lack any support in the record, but they often directly contradict the deposition testimony of Tela's corporate representative on licensing issues.  To avoid tainting the jury with unsupported conjecture masquerading as expert opinion, Intel seeks to exclude the following opinions of Mr. Greene, each of which fails to meet the minimum standards for reliability articulated in FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

**Litigation Risk Adjustment.**  Mr. Greene opines that the royalties paid by Tela's previous licensees Qualcomm, TSMC, and Samsung should be more than ███ for Intel, because each of those licensees supposedly received a ███ "litigation risk" discount from Tela.  Yet Mr. Greene's assumption that Tela actually provided such discounts rests on speculation, and contradicts the unequivocal testimony of Tela's corporate representative that: ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ███████████████.

**First Mover Adjustment.**  Mr. Greene also opines that on top of the ███ noted above, the royalties paid by Qualcomm should be ███ for Intel because Qualcomm allegedly received a "first mover" discount of ███.  This opinion likewise is founded on speculation that Qualcomm actually received such a discount in response to a request it made in negotiations.  Again, Tela's corporate representative testified that ████████████████████████████████

1  ████████████████████████████████████.  In addition, Mr. Greene's opinion

2  improperly disregards that Intel's hypothetical negotiation date predates the Qualcomm agreement,

3  meaning Intel, not Qualcomm, would have been the "first mover" in its hypothetical negotiation with Tela.

4  **Allocation of Value Among Patents.**  Although the damages analysis in this case necessarily

5  relates only to the five patents-in-suit, Tela's previous license agreements cover ███████████

6  ██████████████.  Mr. Greene opines that the lion's share of the value of Tela's overall portfolio should

7  be allocated to the patents-in-suit—three of which did not even exist when the previous agreements were

8  signed—on the grounds that they are the five "most important" patents in Tela's portfolio.  Mr. Greene's

9  report provides no analysis or explanation, whether technical or economic, to support this conclusion.

10  Indeed, this assertion once again contradicts the testimony of Tela's corporate representative that ██

11  ███████████████████████████████████████████

12  ████████████████████████  As a further defect in his opinion

13  regarding the allocation of value, Mr. Greene relies on generalized statistics pertaining to the distribution

14  of value in patent portfolios, without making any attempt to evaluate whether those statistics apply to the

15  particular portfolio at issue in this case.

16  **Reliance on Non-Comparable Licenses.**  In an attempt to bolster his assertion that Intel should

17  pay much more for much less than Tela's previous licensees, Mr. Greene also relies on Intel licenses that

18  he *admits* are not comparable but that happen to involve payments far larger than the comparable Tela

19  licenses.  Mr. Greene offers these non-comparable licenses as alleged support for the broad proposition

20  that Intel is willing to pay a lot of money when it faces risk.  Black-letter law prohibits this transparent

21  attempt to skew the damages horizon by putting non-comparable "big numbers" before the jury.

22  **Unqualified Technical Opinions.**  Mr. Greene further attempts to puff up the perceived value of

23  the patents-in-suit by asserting that several technical achievements touted in Intel presentations are

24  attributable to alleged infringement of the patents-in-suit.  As a damages expert, Mr. Greene is not

25  qualified to offer these technical opinions—which he provides no analysis whatsoever to support—and he

26  admits he did not receive any input from Tela's technical expert on these particular assertions.

27  **Reliance on Untested Royalty Projections.**  In another attempt to shore up his assertion of

28  inflated royalty rates that depart from Tela's actual license agreements, Mr. Greene opines that projections

of future Tela royalty revenues support his damages calculation. Yet these wildly optimistic projections reflect assumptions that Tela itself provided, and their reliability has not been independently tested or evaluated by Mr. Greene or anyone else. Although Mr. Greene admits that the projected royalty rates are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, he takes Tela's self-serving, unsupported projections at face value.

Because each of these aspects of Mr. Greene's analysis falls well short of meeting the minimum standards for a reliable expert opinion, Intel respectfully requests that Tela and Mr. Greene be precluded from using these unreliable opinions to inflate Tela's damages claim.

## II.    BACKGROUND

Tela has entered into patent license agreements with Qualcomm, TSMC, and Samsung, each covering ▮▮▮▮▮▮▮▮▮▮▮▮ These agreements involved payments of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Exs. 1 – 3.) The Qualcomm agreement specifically identifies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 1, Qualcomm Agreement at 13.) When this effective rate for a portfolio-wide license is applied to the accused Intel products—and adding another ▮▮▮ to the rate to arrive at a calculation that is conservative in Tela's favor—it yields a damages amount allegedly owed by Intel of approximately ▮▮▮. (*See* Ex. 4, 5/8/20 Davis Rep., Ex. 3, Schedule C.1.)

As noted above, both parties' damages experts rely on the Qualcomm, TSMC, and Samsung license agreements as their primary basis for calculating damages in this case. Yet Mr. Greene opines that Intel should be required to pay damages of ▮▮▮▮▮ to Tela, which is significantly more than any of Tela's previous licensees paid and is much higher than the amount generated by applying the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—even though the damages analysis in this case is limited to the five patents-in-suit, whereas Tela's previous licensees received rights to ▮▮▮▮▮▮ ▮▮▮▮

In order to arrive at the outlandish proposition that Intel should pay far more for far less than Tela's previous licensees, Mr. Greene offers numerous problematic opinions and assertions that serve to artificially and improperly inflate his royalty calculation beyond any of Tela's previous license agreements. This motion seeks to streamline the dispute over Mr. Greene's faulty analysis by asking the Court to exclude certain opinions that are not supported by any reliable methodology and that are not properly tied to the facts of record.

## III.    ARGUMENT

Rule 702 allows a qualified expert to testify "in the form of an opinion or otherwise," provided that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact… (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702; *see also Daubert*, 509 U.S. 579. To satisfy Rule 702 and *Daubert*'s reliability requirement, the expert's testimony must have "a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). To determine whether this requirement is met, the Court should "assess the [expert's] reasoning or methodology" as appropriate, "based on the particular circumstances of the particular case." *Id.* at 564. The proponent of the expert's testimony has the burden of proving by that the admissibility requirements are met. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Mr. Greene's damages analysis contains numerous opinions that rely on speculation and conjecture, rather than being grounded in any reliable methodology tied to the facts of the case. Several particular opinions that Mr. Greene offers fail to satisfy the minimum thresholds established under Rule 702 and *Daubert*, and should be excluded.

### A.    The "Litigation Risk" Adjustment That Mr. Greene Uses To ▮▮▮ the Asserted Damages Is Speculative and Unsupported.

Mr. Greene seeks to impose a ▮▮▮ increase in the amount of damages alleged against Intel by opining that Tela's licenses with Qualcomm, TSMC, and Samsung were subject to a ▮▮▮ "litigation risk" discount. However, Mr. Greene fails to provide any reliable methodology or analysis to support his speculation that Tela actually provided this ▮▮▮ discount as part of the agreements it reached with those

previous licensees.  Mr. Greene's discussion of this issue not only is speculative, but assumes facts that are directly contradicted by the deposition testimony of Tela's Vice President, Neal Carney, who served as Tela's corporate representative on licensing issues.

**The Qualcomm License.**  Regarding Tela's license agreement with Qualcomm, Mr. Greene asserts that ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████  (Ex. 5, 4/8/20 Greene Rep. ¶ 164 (emphasis added).)  Mr. Greene also quotes testimony from Mr. Carney to the effect that ████████████████████████████████████████████
████████████████████████████████████.  (*Id.*)  On this basis, Mr. Greene assumes Qualcomm actually received this ████ discount and concludes that the royalty rate paid by Qualcomm therefore should be more than ████ for Intel.  As shown in the table below, Mr. Greene applies a "Litigation Risk Discount" to increase the assumed royalty ████████████████████:



(*Id.* ¶ 173, Table 12 (annotated).)

Mr. Greene does not provide any analysis to show that Tela actually gave Qualcomm a litigation risk discount.  He merely relies on the assertion that Qualcomm requested such a discount and that Tela considered it as "one of many factors."  (*Id.* ¶ 164.)  Further, Mr. Carney's fact testimony regarding the Qualcomm license is inconsistent with Mr. Greene's speculation.  Mr. Carney testified that
████████████████████████████████████████████████████████████
████████████████████████████████████.  (Ex. 6, 8/6/19 Carney Dep. at 96:24–
97:14.)  Mr. Carney further testified that he could not provide ████████████████████



(*Id.* at 97:22–98:14.)  There is no basis for Mr. Greene to speculate that Qualcomm actually received a ▮▮▮ litigation risk discount when Tela's own representative who participated in the negotiations—and who testified as its corporate representative on this issue—cannot provide factual information to support that proposition.  *See Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1154–55 (N.D. Cal. 2007) ("an expert report on damages, including a reasonable royalty analysis, may not rely on unreasonable inferences or resort to 'mere speculation or guess'").

Mr. Greene's speculation likewise is not supported by the Tela document he references that refers to ▮▮▮▮▮▮ (*See* Ex. 5, 4/8/20 Greene Rep. ¶ 167.)  Mr. Carney testified that this document reflects ▮▮▮▮▮▮.  For example, Mr. Carney stated this document ▮▮▮▮▮▮ (Ex. 7, 1/23/20 Carney Dep. at 16:6–20.)  He agreed that the document ▮▮▮▮▮▮ (*Id.* at 16:21–25.)

Mr. Greene attempts to show the "reasonableness" of the alleged ▮▮▮ discount by pointing to generic statistics regarding "overall litigation success rate[s]" from a study by PwC. (Ex. 5, 4/8/20 Greene Rep. ¶ 165.)  Again, however, Mr. Greene supplies no methodology or analysis to attempt to tie these generalized statistics to the circumstances here.  For example, he provides no basis for assuming that Tela or Qualcomm arrived at any particular assessment of the likely outcome on validity and infringement in

their litigation, or that they considered or were even aware of the PwC statistics during their negotiations. Notably, courts have previously rejected reliance on versions of this same PwC study for general success-rate statistics not tied to the facts of a particular case. *See Carucel Invs., L.P. v. Novatel Wireless, Inc.*, No. 16-CV-118-H-KSC, 2017 WL 1215838, at *21 (S.D. Cal. Apr. 3, 2017), *aff'd*, 730 F. App'x 938 (Fed. Cir. 2018) (holding 2014 version of "PWC report provides general statistics that are untethered to the facts in this case and, therefore, should be excluded"); *Avocent Redmond Corp. v. Rose Elecs.*, No. C06-1711RSL, 2013 WL 8844098, at *5 (W.D. Wash. Mar. 11, 2013) (holding the "fact that patent holders are successful in only 33% of cases nationwide tells us nothing about the actual or perceived strength of Avocent's claims as it was negotiating the settlement with Raritan"). Mr. Greene's reliance on generic statistics is particularly unwarranted here, where Mr. Carney testified that Tela ███████ ████████████████████████████████████████████████████████████████████████████ (Ex. 6, 8/6/19 Carney Dep. at 95:19–96:23.) Tela invoked privilege to block any further questioning about its assessment of its prospects in litigation. (*See id.* at 24:16–25:5.)

**TSMC and Samsung Licenses.** Mr. Greene's application of a ████ litigation risk adjustment in his analysis of the TSMC and Samsung licenses is even more speculative and baseless. Without providing any justification for doing so, Mr. Greene again uses a ████ "Litigation Risk Discount" factor to more than ████ the assumed royalty payments associated with these agreements—inflating the assumed royalty under the TSMC agreement from ████████████████ and the assumed royalty under the Samsung agreement from ██████████████. (*See* Ex. 5, 4/8/20 Greene Rep. ¶¶ 191, 196; *id.* at Figs. 16–17; *see also id.* ¶¶ 360-64 (unexplained application of ████ discount to royalty projections).)

Once again, Mr. Carney's testimony contradicts Mr. Greene's unsupported assumption of such a discount. Specifically, ████████████████████████████████████████████████ ████████████████████████████:

████████████████████████████████████████████
████████████████████████████████████████████
████
████████████████████████████████████████████
██████████████████████████

(Ex. 6, 8/6/19 Carney Dep. at 99:7–17.)  Mr. Carney likewise testified that ███████████ ████████████████████:

(*Id.* at 100:4–16.)

At his deposition, Mr. Greene attempted to backfill the lack of factual support in his report by asserting that TSMC and Samsung received a litigation discount because ████████████ ███████████████████████████ (Ex. 8, 7/13/20 Greene Dep. at 208:3-209:9.)  Yet this untimely assertion fails to support his speculative opinions.  *First,* Mr. Greene provides no factual basis in his report for his counterintuitive assertion that ████████ ███████████████████████████.  Indeed, Mr. Greene assumes Tela ████████████████ ████████████████████ (*See* Ex. 5, 4/8/20 Greene Rep. ¶ 162.)  *Second,* this unsupported assertion remains inconsistent with Mr. Carney's testimony that ████████████ ██████████████.  (Ex. 6, 8/6/19 Carney Dep. at 99:7–100:16.)  *Third,* Mr. Greene fails to explain how his conclusion that Tela's licensees paid ████████████████ (regardless of how Mr. Greene calculates them) can be reconciled with his assumption that the Qualcomm agreement was blindly applied as the basis for the subsequent deals. ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

Ultimately, Mr. Greene's method of inflating his damages assessment against Intel based on a "litigation risk" adjustment that all of Tela's previous licensees supposedly received is speculative and unreliable, because Mr. Greene provides no support for his assumption that those licensees actually received this discount in any specific amount. On the contrary, the testimony of Tela's corporate representative contradicts it. The highlighted portions of Exhibit 15 identify subject matter in Mr. Greene's report relating to this improper litigation risk adjustment opinion.

**B.    The "First Mover" Adjustment That Mr. Greene Uses To ████ His Damages Calculation Based on the Qualcomm License Is Also Speculative and Unsupported.**

Mr. Greene further seeks to ████ the royalty payment based on Tela's license to Qualcomm (on top of the ████ discussed above) by relying on a ████ "first mover" discount that Qualcomm allegedly received. As with the supposed "litigation risk" discount, this adjustment is not founded on any reliable methodology and is inconsistent with the testimony of Tela's corporate representative.

Mr. Greene asserts—based in part on an unspecified conversation with Mr. Carney—that ████████████████████████████████████████████████████████████ ████████████████████████████████████████. (Ex. 5, 4/8/20 Greene Rep. ¶ 162 (emphasis added).) On this basis, Mr. Greene assumes Qualcomm actually received the specific "first mover" discount it requested, and he accordingly ████ his damages calculation for Intel based on the Qualcomm agreement. (*See, e.g.*, *id.* ¶ 173, Table 12 (using "First Mover Discount" to increase assumed royalty payment from ████████████████).)

Mr. Greene's assertion that Qualcomm actually received this discount is mere speculation and is also contradicted by Mr. Carney's deposition testimony. While Mr. Carney testified ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

████████████████████████████████████

████████████████

(Ex. 7, 1/23/20 Carney Dep. at 18:9–20; *see also id.* at 17:19–20

) (emphasis added).)  Thus, any information Mr. Greene may have received from Mr. Carney

provides no support for Mr. Greene's method of ____ the Qualcomm royalty amount as applied to

Intel.  *See Monolithic*, 476 F. Supp. 2d at 1154–55 ("an expert report on damages, including a reasonable

royalty analysis, may not rely on unreasonable inferences or resort to 'mere speculation or guess'").

Mr. Greene also attempts to support his assumption that Qualcomm received a "significant" first

mover discount by asserting that ____.

(*See* Ex. 5, 4/8/20 Greene Rep. ¶ 162.)  However, Mr. Greene provides no methodology or analysis to

correlate the calculated difference in rates with a ____ "first mover" discount for Qualcomm.  For example,

as noted above, Mr. Greene calculates a (pre-adjustment) effective royalty rate of ____ for TSMC,

which is ____ higher than the ____ (pre-adjustment) effective royalty rate he calculates

for Qualcomm.  (*Id.* ¶ 359, Table 26.)  This ____ difference cannot be attributed solely to Qualcomm's

supposed ____ "first mover" discount, and Mr. Greene fails to explain or provide support for what fraction

of this difference is attributable to that alleged discount, as opposed to other factors he fails to identify.  In

addition, under Mr. Greene's alternative approach of using so-called "Relevant" Qualcomm U.S. sales for

the royalty base, Qualcomm paid a ____ rate than TSMC and Samsung, which conflicts with his opinion

that a "first mover" adjustment caused Qualcomm to receive a discount relative to the other licensees.

Significantly, Mr. Greene also fails to provide any reliable methodology or basis for concluding

that this alleged "first mover" adjustment would not have been provided to Intel in the parties' hypothetical

negotiation.  Mr. Greene acknowledges that Intel's hypothetical negotiation would occur before the

Qualcomm license.  (*Id.* ¶ 163.)  Indeed, Mr. Carney testified that

(Ex. 7, 1/23/20 Carney Dep. at 22:2–21.)  Mr. Greene nevertheless asserts that

Intel should not receive a "first mover" discount because it "did not actually enter into the agreement

first." (Ex. 5, 4/8/20 Greene Report ¶ 163.) That conclusion disregards the basic concept of a *hypothetical* negotiation that would have taken place on a specific date under circumstances existing at the time. The record establishes that in this hypothetical negotiation, Intel—not Qualcomm—would have been the first mover. The highlighted portions of Exhibit 16 identify subject matter in Mr. Greene's report relating to this improper first mover adjustment opinion.

**C.    Mr. Greene's Allocation of Value Among Tela's Patents Is Speculative and Unsupported.**

**1.    Mr. Greene Does Not Reliably Allocate Value to the Patents-in-Suit Relative to Tela's Overall Portfolio.**

As discussed above, Mr. Greene arrives at his damages opinion by deriving effective royalty rates from Tela's previous licenses with Qualcomm, TSMC, and Samsung and then making unsupported adjustments to those rates to derive an inflated royalty rate to apply against Intel. One complication facing Mr. Greene is that whereas Tela's previous licenses covered ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, this case involves only five asserted patents in one category of technology. Mr. Greene purports to address this issue by allocating 50% of the value of Tela's entire portfolio to this tiny handful of patents. Mr. Greene lacks any reliable methodology for arriving at this allocation, and instead bases his analysis on the assumption that certain patents are the "most important." There is no support for that assumption, which again is contradicted by the testimony of Mr. Carney.

Tela's licenses with Qualcomm, TSMC, and Samsung covered ▮▮▮▮▮▮▮▮▮▮. (Ex. 6, 8/6/19 Carney Dep. at 209:3–6.) That portfolio includes: (i) patents related to gate-length biasing (which is unrelated to lithography), referred to as "Power Patents"; (ii) 50 patents related to layouts for optimizing lithography that are already licensed to Intel under a covenant not to sue; and (iii) another 92 patents related to layouts for optimizing lithography that Tela contends are not licensed to Intel. (Ex. 5, 4/8/20 Greene Rep. ¶ 207, Greene Ex. F.6.) The five patents-in-suit belong to the third category, which Mr. Greene calls the "4 Series" patents. (*Id.*) Mr. Greene assumes the "4 Series" patents are the "most important" category in Tela's portfolio and that the five patents-in-suit are the "most important" within the "4 Series" category. (*Id.* ¶¶ 221, 223.) On this basis, he allocates to the five patents-in-suit 50% of the royalties that Qualcomm, TSMC, and Samsung paid for a license under Tela's ▮▮▮▮▮▮:



(*Id.* ¶¶ 223, 359, Table 26 (detail) (highlighting added).)

Mr. Greene provides no analysis or methodology to support his assertion that the five patents-in-suit are the "most important" of the 92 "4 Series" patents, or that this is the most important category in Tela's portfolio. In fact, his speculation is contradicted by Mr. Carney's testimony that



(Ex. 6, 8/6/19 Carney Dep. at 209:7–210:11.) Mr. Carney also acknowledged that Tela

(*See id.* at 81:2–11, 86:7–16, 89:22–90:11.)

Mr. Greene seeks to support his assertion that the "4 Series" patents collectively are more "important" than Tela's other layout patents and its gate-length biasing patents by referring to anecdotal

discussions that supposedly took place during Tela's licensing negotiations.  (*See* Ex. 5, 4/8/20 Greene Report ¶ 223.)  Yet Mr. Greene fails to provide a reliable basis for these assertions, which again are contradicted by Mr. Carney's testimony that

(Ex. 6, 8/6/19 Carney Dep. at 78:15–25, 83:6–10.)

Mr. Greene further asserts that the lion's share of the value of Tela's portfolio should be attributed to the 4 Series family collectively because that is the family Intel and Tela discussed prior to this litigation and "would likely be viewed by Intel as the most valuable." (Ex. 5, 4/8/20 Greene Rep. ¶ 210.)  But that reasoning is disconnected from Mr. Greene's theory of damages.  As explained above, Mr. Greene purports to calculate a reasonable royalty payment from Intel based on royalties that                         For purposes of that analysis, the relevant question is what value those licensees placed on the asserted patents versus                         —and hence what amount should be excluded from previous royalty payments to arrive at a royalty for the asserted patents alone.

For example, if Tela's other licensees placed a significant value on unasserted patent families, this would require a significant reduction in the previous royalty payments to reflect only the patents asserted in this case. The fact that Intel has no need for or interest in a license to Tela's other patents—for which it either already has a covenant not to assert or there is no alleged infringement—has no bearing on the question of how other licensees who did *not* have such a covenant and who *were* accused of infringing other patents would allocate value within the portfolio.

At his deposition, Mr. Greene again attempted to backfill this gap in his report by asserting that the five patents-in-suit are the most important because ███████████████████████████ ████████████████████████████ (Ex. 8, 7/13/20 Greene Dep. at 241:13–242:9.) This untimely assertion fails to provide a reliable basis for his opinion. *First,* Mr. Greene cannot reliably base his opinion on alleged inferences about ███████████████████████████████ ███████████████████████████████. (Ex. 6, 8/6/19 Carney Dep. at 209:7–210:11.) *Second,* Mr. Greene applied no methodology or analysis to evaluate the reasons for ██████████████████████████████████ ███████████████████████████████. *See Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 850705, at *3 (N.D. Cal. Mar. 13, 2012) (striking opinion that three patents-in-suit were assumed to be the "top three" within a larger group of patents because the plaintiff had asserted that the defendant "decided to infringe those three asserted patents"). For instance, patents that could potentially have greater economic value due to broader claim scope might have been excluded from this suit due to concerns over validity, whereas narrower patents with lesser economic value might have been been selected to try to strengthen Tela's validity case. Without reliable expert analysis on this issue, Tela's ███████████ is a black box that does not reliably reflect economic value. *Third,* Mr. Greene provides no basis for assuming that Tela ███████████ its "most important" patents in this case, when Tela chose to assert five *other* "4 Series" patents, two other layout patents, and two gate-length biasing patents in previous litigations against TSMC and involving devices containing Qualcomm chips. (*See* Ex. 9, 2/7/13 Tela Complaint at 1; Ex. 10, 4/3/14 Tela Amend. Complaint at 1.)

### 2. Mr. Greene's Theory for Allocating Value Among Patents Relies on General Statistics That Are Not Tied to the Facts of This Case.

Another defect in Mr. Greene's methodology regarding allocation is that he relies on statistics that are not tied to the facts of this case. After asserting that the five patents-in-suit are the "most important" in Tela's entire portfolio, Mr. Greene calculates that these patents constitute the "top 4.7%" of the unlicensed layout patents. (Ex. 5, 4/8/20 Greene Rep. ¶¶ 213–14.) To calculate the value share allegedly attributable to the top 4.7% of patents in the portfolio, Mr. Greene relies on statistics described in papers by Jonathan Putnam and Mark Schankerman regarding the distribution of value among patents in certain patent portfolios. (*See id.* ¶¶ 220–22.) Based on those statistics, Mr. Greene allocates *50%* of the value of Tela's entire portfolio of over 200 patents to the five patents-in-suit. (*Id.* ¶ 223.) However, Mr. Greene fails to provide any reliable basis for tying the two papers' generalized statistics regarding value distribution to the particular facts and portfolio at issue here.

Dr. Putnam's paper cautions that it addresses only "some of the factors that may contribute" to a damages analysis, which will depend on "additional facts that are specific to any given case." (Ex. 11, Putnam Paper at cover page n.2.) Dr. Putnam acknowledges that "any given patent portfolio need not conform exactly to the relationships reported [in his paper], especially as sample sizes decrease." (*Id.* at 20.) Despite these cautions, Mr. Greene admits that he failed to analyze whether Dr. Putnam's statistics actually fit the facts of this case. For example, Mr. Greene acknowledged that he does not know whether the patent portfolios considered by Drs. Putnam and Schankerman are similar to Tela's. (*See* Ex. 8, 7/13/20 Greene Dep. at 84:25–86:19.) Nor did he ask Dr. Foty to conduct any technical analysis to determine whether the papers' analyses apply. (*Id.* at 86:20–24.) Indeed, Mr. Greene admitted that he relied entirely on the generalization that



(*Id.* at 87:24–88:6.)

Further, Mr. Greene failed to consider specific reasons why the portfolio at issue here is meaningfully different from those considered in the two papers. For example, the "4 Series" family of patents to which Mr. Greene applies the statistics at issue consists of closely-related patents that all claim priority to the same application. (Ex. 5, 4/8/20 Greene Rep. ¶ 47.) Mr. Greene provides no basis to justify his counterintuitive assumption that a group of closely-related patents would be subject to the extreme differences in value suggested by Drs. Putnam's and Schankerman's data. Drs. Putnam and Schankerman also indicate that their value distribution calculations are derived from analyses of particular portfolios regarding patent renewal rates, patent filing patterns, and citations by later patents. (*See* Ex. 11, Putnam Paper at 12-13; Ex. 12, Schankerman Paper at 79.) Mr. Greene does not attempt to examine or analyze any such metrics for Tela's portfolio to determine whether there is any reasonable basis to assume a correlation with the papers' statistics. *See TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson,* No. CV 15-2370 JVS(DFMX), 2018 WL 4488286, at *23 (C.D. Cal. Sept. 14, 2018), *rev'd in part and vacated in part on other grounds*, 943 F.3d 1360 (Fed. Cir. 2019) (excluding reliance upon statistics from Dr. Putnam's paper because "[t]he Court [was] not persuaded Putnam's findings are applicable to telecommunications SEPs" comprising the patent portfolio at issue in that case).

### 3.    Mr. Greene Does Not Reliably Allocate Value to Subsets of the Patents-in-Suit.

As noted above, Mr. Greene allocates value to the five patents-in-suit based on an assumption that these are the "most important" patents in Tela's portfolio and that they represent the "top 4.7%" of the unlicensed layout patents. (Ex. 5, 4/8/20 Greene Report ¶¶ 221, 223.) He then purports to determine the value attributable to the "top 4.7%" of those patents using statistics found in Drs. Putnam's and Schankerman's papers—which he concludes is 50%. (*Id.* ¶ 223.) Adding to the significant defects in this methodology, Mr. Greene purports to opine on valuations for subsets of the five patents-in-suit without explaining how his opinions can be reconciled with his preceding analysis (addressed above).

It necessarily follows from Mr. Greene's theory that if a smaller number of patents-in-suit is asserted, there must be a smaller allocation of value. For example, if Tela proceeded on only three patents, this would represent only 2.8% of the unlicensed layout patents, and should have a value share lower than

the 50% Mr. Greene calculated for 4.7% of the unlicensed layout patents. Yet Mr. Greene proceeds to apply exactly the same 50% allocation *regardless* of how many of the five patents-in-suit remain in the case.

In particular, Mr. Greene considers scenarios where Tela drops the '012 patent ("Alternative Damages 1"), drops both the '012 and '966 patents ("Alternative Damages 2"), or drops every patent aside from the '523 patent ("Alternative Damages 3"). (*See id.* ¶¶ 380–82.) In each scenario, Mr. Greene applies the same allocation of 50% of the value of Tela's entire portfolio (labeled "Patent Apportionment" in the tables below) that he applied in his primary calculations for all five patents-in-suit—with minor differences in the resulting effective royalty rates owing to other factors in his analysis:



(Ex. 5, 4/8/20 Greene Exs. D.1–D.4 (highlighting added)). Mr. Greene does not even attempt to explain—let alone provide any reliable analysis to support—his continued use of the same 50% value share in each of these scenarios, where the number of patents (and hence the percentage of Tela's larger portfolio)

changes significantly.  The highlighted portions of Exhibit 17 identify subject matter in Mr. Greene's report relating to these improper opinions regarding allocation of value among patents.

### D.    Mr. Greene Improperly Relies on Undisputedly Non-Comparable License Agreements.

Both parties rely on Tela's licenses with Qualcomm, TSMC, and Samsung as comparable royalty agreements for purposes of their damages analyses in this case.  Intel also relies on two of its own licenses that relate to technology comparable to the patents-in-suit.  Besides those licenses, Intel produced—in response to Tela's demands—copies of numerous other licenses that both parties agree are *not* comparable.  Mr. Greene nevertheless purports to rely on these undisputedly irrelevant licenses for the proposition that Intel sometimes pays significant amounts for patent licensing.

It is black-letter law that an expert cannot rely on non-comparable licenses to support a royalty-based damages analysis.  The Federal Circuit has emphasized that the damages analysis "must carefully tie proof of damages to the claimed invention's footprint in the market place."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).  "Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute."  *Id.*  It is "[w]ith these principles in mind" that insufficiently comparable licenses are excluded from consideration.  *Id.* (citing *Lucent Techs., Inc. v. Gateway*, 580 F.3d 1301, 1327–28 (Fed. Cir. 2009)).

Here, Mr. Greene purports to rely upon licenses that are admittedly non-comparable—and that relate to different technology and circumstances that have no bearing on the "footprint in the market place" of Tela's purported invention.  For example, Mr. Greene discusses an agreement with Nvidia under which Intel paid $1.5 billion in return for the release of certain commercial claims and a license to Nvidia's patent portfolio, which focuses on graphics processing technology.  (Ex. 5, 4/8/20 Greene Rep. ¶ 249.) Mr. Greene also discusses an agreement with ███████████████████████████████████ ████████████████████████████████████████████████  (*Id.* ¶ 251.)  Mr. Greene expressly acknowledges that these agreements are non-comparable, stating: "While *these licenses are not comparable* to a hypothetical license between Tela and Intel [they] are instructive as to Intel's general licensing practices and its willingness to make significant lump sum payments where it recognizes infringement risks to the sales of the Accused Products."  (*Id.* ¶ 261 (emphasis added).)  Mr. Greene also

purports to rely on these non-comparable licenses as one of several "other quantitative factors" that supposedly support his damages opinions. (*Id.* ¶¶ 361, 365.)

Mr. Greene provides no methodology or analysis to show how these non-comparable agreements can play any legitimate role in a damages analysis in this case. While Mr. Greene purports to rely on these agreements to support vague propositions about Intel's "general licensing practices" and its supposed "willingness to make significant lump sum payments," the Federal Circuit rejected exactly such an effort in *Lucent v. Gateway*. In that case, the plaintiff's expert provided "superficial" testimony about several license agreements, focusing primarily on the large payments made under them. *See Lucent*, 580 F.3d at 1328–29. The Federal Circuit held that the expert's references to large payments in other licenses were improper because the plaintiff "had the burden to prove that the licenses were sufficiently comparable" and it had not met that burden. *Id.* at 1329; *see also Digital Reg of Tex., LLC v. Adobe Sys., Inc.*, No. C 12-1971 CW, 2014 WL 4246158, at *2 (N.D. Cal. Aug. 27, 2014) (excluding "any mention of the high dollar amounts associated with" a license deemed not comparable to the hypothetical negotiation "because it would skew the jury's perception of a reasonable royalty").

Mr. Greene's reliance on these non-comparable licenses to opine on Intel's alleged willingness to make large payments also amounts to a thinly-veiled and impermissible attempt to skew the jury's damages evaluation. The license agreements that both parties treat as comparable involve royalty payments of ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████. The $1.5 billion and ████████ payments in the non-comparable Nvidia and ████████████ agreements are much higher, and introducing these "big numbers" is transparently intended to generate a context where it would be easier for the jury to accept Tela's demand that Intel pay much more than any previous licensee (*i.e.*, the ████████ royalty asserted by Mr. Greene) in return for much less (namely, a license to only five patents-in-suit). This ploy does not reflect reliable expert analysis and should be excluded. *See ResQNet.com*, 594 F.3d at 870 (rejecting expert opinion that served to "drive the royalty rate up" by relying on non-comparable agreements involving payments significantly higher than in comparable agreements); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320–22 (Fed. Cir. 2011) (rejecting attempts to introduce

large figures that could "skew the damages horizon for the jury"). The highlighted portions of Exhibit 18 identify subject matter in Mr. Greene's report relating to improper reliance on non-comparable licenses.

### E.  Mr. Greene Improperly Offers Technical Opinions That Are Beyond His Expertise as a Damages Expert.

Mr. Greene asserts that several technical achievements touted in Intel presentations about Intel technology are attributable to Tela's patents. (*See* Ex. 5, 4/8/20 Greene Rep. ¶¶ 304–16.) Mr. Greene provides no methodology or analysis to support these technical opinions, which are well outside the scope of his expertise as a damages expert.

In connection with *Georgia Pacific* factor 11 (regarding use of the patented technology), Mr. Greene asserts that several technical achievements highlighted in Intel presentations are tied to Intel's alleged use of Tela's patents. For example, Mr. Greene excerpts an Intel presentation regarding the "scaling" and "density" benefits achieved by Intel's 10 nm products:



(*Id.* ¶ 311, Fig. 14.) Mr. Greene asserts that these specific technical benefits are due to alleged infringement: "For example, by using Tela's patented technology, Intel is able to increase transistor density by 2.7x in its 10nm Products over its 14nm Products." (*Id.* ¶ 311.) Mr. Greene also makes several similar assertions that specific Intel achievements are attributable, at least in part, to alleged infringement. (*See, e.g.*, *id.* ¶¶ 307 ("Through the use of Tela's patented technology, Intel's 22nm Products were able to achieve this increased transistor density while also improving manufacturability."), 309 ("The reduction in feature pitch sizes [in Intel's 14 nm products] is achieved, in part, by implementing Tela's patented

technology."), 312 ("The reduction in feature pitch sizes at 10nm is achieved, in part, by implementing Tela's patented technology.").)

Mr. Greene lacks the technical expertise to opine that specific technical achievements are tied to any alleged use of the patents-in-suit. Mr. Greene is a Certified Public Accountant and does not have any technical training. (*See* Ex. 5, 4/8/20 Greene Rep. ¶¶ 14–17.) Indeed, he readily admits he's "not a technical expert" and has only a "layman's understanding" of the technology at issue. (Ex. 8, 7/13/20 Greene Dep. at 83:1–7, 114:12–19, 136:25–137:4.) "A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion." *White v. Ford Motor Co.*, 312 F.3d 998, 1008–09 (9th Cir. 2002).

Mr. Greene's assertions regarding technical aspects of Intel's products are also not supported by any input from Tela's technical expert, Dr. Foty. Dr. Foty's report does not even address the technical achievements noted in the Intel presentations on which Mr. Greene relies. *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.,* No. 11-515-LPS-CJB, 2015 WL 12731924, *5-*7 (D. Del. Nov. 4, 2015) (rejecting reliance by damages expert upon input from technical expert that was not included in the technical expert's report). Further, Dr. Foty testified that his conversations with Mr. Greene were limited to general information about the "nature of a semiconductor manufacturing process and things of that nature." (Ex. 13, 7/9/20 Foty Dep. at 8:1–25.) Mr. Greene likewise confirmed that Dr. Foty did not provide any input concerning the Intel presentations. (Ex. 8, 7/13/20 Greene Dep. at 123:25–124:23.) Instead, Mr. Greene's "methodology" consisted solely of searching on his own through Intel presentations to find



(*Id.* at 126:12–19). At best, Mr. Greene is improperly extrapolating from other expert opinions that he is not qualified to evaluate or apply. *See, e.g., Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, No. 8:14-CV-01352-JLS-KES, 2019 WL 8138163, at *3 (C.D. Cal. Nov. 20, 2019) (excluding expert testimony where expert lacked expertise necessary to conduct "an independent evaluation of others' conclusory statements" regarding particular claim limitations). There is no reliable method behind Mr. Greene's effort to hunt within Intel's presentations for certain words mentioned by Dr. Foty. Even if one were to assume that Tela's patents do provide some benefit related to broad concepts such as "density" and "scaling," Mr. Greene provides no basis for attributing the specific improvements noted in Intel's presentations—such as "increase transistor density by 2.7x in [Intel's] 10nm Products over its 14nm Products"—to Tela's patents. (Ex. 5, 4/8/20 Greene Rep. ¶ 311.) Notably, Mr. Greene does not attempt to explain why the technologies that the presentations themselves identify as the source of this increase in transistor density— such as FinFETs and self-aligned patterning—supposedly are not responsible for it. (Ex. 14, 7/10/20 Foty Dep. at 346:13–347:17) (agreeing that Intel's presentation attributes scaling benefits to FinFET and self-aligned patterning technology). The highlighted portions of Exhibit 19 identify subject matter in Mr. Greene's report relating to these improper technical opinions.

## F.    Mr. Greene Relies on Untested and Unsupported Projections of Future Tela Royalty Income.

Although Mr. Greene primarily relies on Tela's previous license agreements with other entities to support his damages opinions, he asserts that his opinions are also supported by "quantitative factors" relating to projections of future licensing royalties from Tela's portfolio. (*See* Ex. 5, 4/8/20 Greene Rep. ¶¶ 360–64; *see also id.* ¶ 11 f (relying on valuation projections as part of the "basis for my conclusions").) For example, Mr. Greene asserts that a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶ 362; *see also id.* ¶¶ 107–09.) Mr. Greene cites similar projections found in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See id.* ¶¶ 110–18, 363–64.) These projections contain very high numbers, such as a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ amount of damages Mr. Greene opines are appropriate in this case. (*Id.* ¶ 118.)

It is inappropriate for Mr. Greene to rely on these projections of future royalties because he has taken no steps to independently verify or evaluate their reliability. Significantly, although several of the cited projections are contained in ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████ Mr. Greene also confirmed that he did not perform any analysis to evaluate Tela's projections, nor did he review the underlying materials that Tela used to arrive at them. (*See id.* at 196:22–197:5, 199:9–12, 203:1–3.) Mr. Greene therefore has no basis for relying on these projections. *See United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, No. 15-CV-02383-RS, 2018 WL 5013580, at *2 (N.D. Cal. Oct. 16, 2018) (noting that "an expert may not rely merely on the self-serving projections of his client" and an "independent analysis" of such projections is "consistent with [his] obligations as an expert under Rule 702 and Daubert"); *Clear-View Techs., Inc. v. Rasnick*, No. 13-CV-02744-BLF, 2015 WL 3505003, at *3 (N.D. Cal. June 2, 2015) (same).

Indeed, Mr. Greene admits that at least certain of Tela's projections are inconsistent with his own analysis. In particular, he testified that Tela arrived at a projected ███████████████████ ████████████████████████████████████ (presumably to reflect the greater scope of non-accused technology in Intel's products). (*See* Ex. 8, 7/13/20 Greene Dep. at 217:10–218:5.) But Mr. Greene admits he does now know how Tela obtained the ████████████████████ and that this figure is inconsistent with the record:

████████████████████████████████████████████

███████████████████████

███

1

███████████████████████████████████████
2
███████████████████████████████████████
3
████████████████████████████████████
4
███████████████████████████████████████
5
6
7
(*Id.* at 218:6-219:12.)  Mr. Greene should not be permitted to offer opinions based on these unsupported

8
and unreliable projections.  The highlighted portions of Exhibit 20 identify subject matter in Mr. Greene's

9
report relating to this improper reliance on unreliable royalty projections.

10
**IV.     CONCLUSION**

11
        Not content with the royalty rates contained in Tela's previous, comparable license agreements,

12
Mr. Greene relies on unsupported assumptions and specious methodologies to improperly inflate his

13
damages calculation and to conclude that Intel should pay far more money for a far smaller benefit than

14
Tela's actual licensees.  While many of the assertions and opinions that lead to this conclusion are

15
problematic, the specific opinions addressed in this motion all fail to meet even the minimum standard for

16
reliability set forth in *Daubert*.  To avoid exposing the jury to this bare speculation disguised as expert

17
opinion, the Court should exercise its gatekeeping function and exclude these improper opinions.

18

19

20

21

22

23

24

25

26

27

28

1    DATED:  September 4, 2020                    Respectfully submitted,

2                                                By:  _/s/ Todd M. Friedman_____

3                                                Adam R. Alper (CA Bar No. 196834)
                                                 Bao Nguyen (CA Bar No. 198023)
4                                                KIRKLAND & ELLS LLP
                                                 555 California Street
5                                                San Francisco, CA 94194
                                                 Telephone: (415) 439-1400
6                                                Facsimile: (415) 439-1500
                                                 Email: adam.alper@kirkland.com
7                                                Email: bao.nguyen@kirkland.com

8
                                                 Gregory S. Arovas, P.C. (*pro hac vice*)
9                                                Todd M. Friedman, P.C. (*pro hac vice*)
                                                 Alex R. Henriques (*pro hac vice*)
10                                               Jeremy Wilson (*pro hac vice*)
                                                 KIRKLAND & ELLIS LLP
11                                               601 Lexington Avenue
                                                 New York, NY 10022
12                                               Telephone: (212) 446-4800
                                                 Facsimile: (212) 446-4900
13                                               Email: greg.arovas@kirkland.com
                                                 Email: todd.friedman@kirkland.com
14                                               Email: alex.henriques@kirkland.com
                                                 Email: jeremy.wilson@kirkland.com
15

16                                               Nyika O. Strickland (*pro hac vice*)
17                                               David Rokach (*pro hac vice*)
                                                 G. William Foster (*pro hac vice*)
18                                               KIRKLAND & ELLIS LLP
                                                 300 N. LaSalle Street
19                                               Chicago, IL 60654
                                                 Telephone: (312) 862-2000
20                                               Facsimile: (312) 862-2200
                                                 Email: nyika.strickland@kirkland.com
21                                               Email: david.rokach@kirkland.com
                                                 Email: billy.foster@kirkland.com
22

23                                               Attorneys for Plaintiff
                                                 INTEL CORPORATION
24

25

26

27

28

**CERTIFICATE OF SERVICE**

On September 4, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

_/s/  Todd M. Friedman_____